UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNIVERSITY OF CINCINNATI<br>2618 University Circle<br>625 University Pavilion<br>Cincinnati, Ohio 45221<br><br>        Plaintiff,<br>v.<br><br>BRENDAN SORSBY<br>1183 Manhattan Blvd., Apt. 2214<br>Dayton, Kentucky 41074<br><br>        Defendant. | Case No.: |

**COMPLAINT FOR DAMAGES**

Plaintiff, the University of Cincinnati ("University"), by counsel, and for its action for damages against Defendant, Brendan Sorsby ("Sorsby"), alleges and states as follows:

**Introduction**

1. This is a breach of contract action in which the University seeks to enforce its rights under a name, image, and likeness ("NIL") agreement between the University and Sorsby, its former starting quarterback. In July 2025, Sorsby, represented by a professional sports agent, negotiated and entered into an 18-month, two-season NIL agreement with the University. Through that multi-million-dollar agreement, the University acquired a license to use Sorsby's NIL in its promotional materials and activities. That license enabled the University to elevate Sorsby as a University representative. This led to positive publicity and goodwill for the University and its football program and, in turn, provided Sorsby the platform to build his brand as an athlete and public figure. As expressly acknowledged in the agreement, both parties expected Sorsby's NIL to have "increasing [ ] value over time as the University's promotional efforts and [his] success

help to augment [his] recognition and visibility." Although the University agreed to pay Sorsby a substantial amount of license compensation over the 2025 season, it did so with the express expectation that it would realize the majority of the benefits during the following season, 2026, after Sorsby's play developed and his brand grew.

2. Sorsby agreed that, if he failed to fulfill the whole term of the NIL agreement, such as by transferring to another institution after the fall 2025 season, that breach would cause financial harm to the University. Because those damages were difficult to estimate at the time the parties signed the NIL agreement in the summer of 2025, they agreed that a mutual best estimate of the damages would be $1 million. Sorsby thus promised to pay to the University $1 million in liquidated damages if he transferred to another university before completion of the agreement's full term.

3. On December 1, 2025, merely five months into the term of the NIL agreement, Sorsby informed the University that he (1) was done playing for the University, (2) would no longer participate in more practices or team activities, and (3) would not play or attend the University's January 2, 2026, bowl game.

4. On December 15, 2025, Sorsby filed formal paperwork with the University stating his intent to transfer to another institution and to play college football elsewhere.

5. On January 2, 2026, Sorsby formally entered the transfer portal and almost immediately thereafter signed a lucrative new NIL agreement with another university. According to media reports, Sorsby's new NIL deal is worth between $4 million and $6 million for one season of play, and it took into consideration Sorsby's contractual obligation to make the University whole for the damages that he acknowledged his breach and abandonment would cause.

6. Despite the clear contractual obligation to do so, and despite his ability to pay, Sorsby still has not paid the University the $1 million in liquidated damages he agreed to pay. Prior

2

to initiating litigation, the University inquired as to Sorsby's intentions to pay the amount owed, and Sorsby's representative advised that Sorsby refuses to pay the University anything. Sorsby has benefited greatly by the NIL agreement he entered into with the University, along with the University's sustained efforts to promote him and help establish him as a top collegiate quarterback. Now, the University seeks to enforce its rights under that same agreement and to recover the amount Sorsby is contractually obligated to pay.

## Parties, Jurisdiction, and Venue

7. The University is a citizen of the State of Ohio. It is a state institution of higher education organized under Chapter 3361 of the Ohio Revised Code, having its primary business address at 2618 University Circle, 625 University Pavilion, Cincinnati, OH 45221.

8. Sorsby is a citizen of either the Commonwealth of Kentucky or the State of Texas.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship between the University and Sorsby.

10. This Court has personal jurisdiction over the parties. The University resides in this State, this lawsuit arises from Sorsby's contacts and activities in Ohio, and the contract at the center of this action calls for the parties' performance chiefly in Ohio. That contract also specifies an Ohio forum for the resolution of disputes.

11. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this District because a substantial part of the events giving rise to this action occurred in this District.

**Facts**

12. The University sponsors a NCAA Division I Football Bowl Subdivision football program, competing in the Big 12 Conference ("Big 12"). The "Cincinnati Bearcats" is the name of the football team, and all sponsored NCAA teams, representing the University.

13. As a member of the Big 12, a conference spanning several large media markets and ten states, the Cincinnati Bearcats football team has cultivated a national brand to maintain competitiveness with larger public schools within the conference and nationally.

14. Sorsby is a student and Division I college football quarterback and became the University's primary starting quarterback in 2024. He started all 12 games that season.

15. Sorsby benefited from the national attention that his affiliation and success with the University's football program generated for him.

16. He also benefited from the University's support, coaching, and training, which helped him develop as a student-athlete and a public figure. Throughout Sorsby's redshirt sophomore year (2024), the University regularly demonstrated its commitment to him as a student and person by providing personal, housing, and academic support, in addition to supporting him as a football player.

17. Effective July 1, 2025, the NCAA rules changed to permit universities to directly pay their student-athletes for the use of their names, images, and likenesses ("NIL").

18. With the full expectation that Sorsby would continue to grow and succeed as a quarterback with the support of the University's coaching staff, such that his personal recognition and visibility would continue to grow as well, the University agreed to license Sorsby's NIL. The University did so with the expectation that he could become a significant source of goodwill to promote the University's brand and visibility.

19. On July 1, 2025, Sorsby, with the advice and representation of a professional sports agent, entered into a contract with the University (the "Agreement") under which the University obtained a license to use Sorsby's NIL for the 2025 and 2026 seasons.

20. The term of the Agreement is from July 1, 2025, through December 15, 2026 (the "Term").[1]

21. This Term would have effectively served the parties through the expiration of Sorsby's college eligibility.

22. By virtue of the Agreement, Sorsby granted the University the right and license to use and exploit, "in whole or in part," his "NIL Rights," defined as:

> (i) [Sorsby's] name, nickname(s), image, picture, likeness, initials, biographical data, photograph, caricature, facsimile image, voice, streaming video or audio, autograph, signature, video or film portrayals, digital graphical representation, signature moves, quotes, phrases, interviews, statistics, facsimile signature, and any other identifiable features and means of endorsement associated with [Sorsby], whether now known or arising or otherwise developed during the Term of this Agreement; (ii) any and all trademarks, service marks, trade names, domain names, rights of publicity, copyrights, designs or other intellectual property rights owned by or on behalf of [Sorsby] relating to, based on or derived from any of the foregoing; and (iii) any and all other materials or indicia of origin relating to or identifying [Sorsby] or any of the foregoing.

23. By virtue of the Agreement, Sorsby acknowledged and agreed, among other things, that:

> (a) [Sorsby's] status as a highly-visible collegiate athlete who is currently enrolled as a student at the University … and is eligible under NCAA Rules to participate in the University's Program, is a material inducement for the University's entry into this Agreement and the valuation of the NIL Rights; and (b) the value of the NIL Rights are materially and directly tied to [Sorsby's] maintenance of such status . . . .

---

[1] The Agreement contains a confidentiality clause that prohibits the parties from disclosing it or its terms that contain Confidential Information, as defined in the Agreement. If the Court requires a copy of the Agreement, it will be filed under seal at the appropriate time.

5

In furtherance of the above, Sorsby acknowledged and agreed to exercise his best efforts to act and behave "in such a manner so as to protect and maintain the value of the NIL Rights."

24. In the Agreement, Sorsby also agreed that he "shall not engage in any activity that would be contrary or conflicting with any marketing, advertising, publicizing, promotional or endorsement activity or agreement entered into by the University."

25. In the Agreement, Sorsby explicitly acknowledged "that the University has invested considerable time in recruiting [him] in anticipation that [he] will have a long, productive and successful career at the University[.]"

26. Sorsby also acknowledged that his NIL was expected to have "increasing [ ] value over time as the University's promotional efforts and [his] successes help to augment [his] recognition and visibility."

27. Sorsby's future NIL value was uncertain at the time of the Agreement's execution before the 2025 season, particularly without knowledge as to how Sorsby's performance, personal recognition, and visibility would grow over the course of the Term. Furthermore, the value of his future NIL, in all its iterations and potential, was (and is) difficult to quantify.

28. However, the University expected that Sorsby would continue to grow and succeed as a quarterback thanks in part to the University's coaching, facilities, and platform, and that his personal recognition and visibility also would continue to grow based on the University's platform to give him national exposure. The University also fully expected that Sorsby could become a significant source of goodwill to promote the University's brand and visibility over the course of the Term, covering the 2025 and 2026 seasons. The University therefore signed Sorsby to a generous, multi-million dollar Agreement, to be paid over the course of the Term. In agreeing to that amount before the 2025 football season, the Agreement expressly provides: "[Sorsby]

6

understands and agrees that the Fees are a fair market amount based on the projected or expected promotional value, as of the time this Agreement is entered into by the Parties [July 1, 2025], of [Sorsby's] NIL Rights over the course of the Term . . . and constitutes all consideration due and owing from the University during the Term for the covenants contained in this Agreement."

29. The University's confidence in Sorsby proved to be well placed. During the 2025 football season—the first season of the Agreement's Term—Sorsby improved as a player and led the team to a winning (7–5) season. Every University football game was broadcast—ten of them to a national television audience—which increased Sorsby's visibility and recognition.

30. Now a household name beyond University fans and alumni, Sorsby was recognized by national college football fans as a cornerstone representative of the University's team, as the team looked ahead to the 2026 season. Indeed, it appeared that, as anticipated in the Agreement, the value of Sorsby's NIL was "increasing [in] value over time as the University's promotional efforts and [his] successes help[ed] to augment [his] recognition and visibility," as bargained for by the University.

31. Although Sorsby agreed to license his NIL to the University for a specific amount of money over the entire Term from July 1, 2025 through December 15, 2026, the Agreement also provided: "[Sorsby] agrees to negotiate with the University, exclusively and in good faith, prior to the end of the Term, to enter into a renewed agreement for the University to continue to license [Sorsby's] NIL Rights." Thus, if Sorsby wanted to renegotiate his NIL licensing payment, which covered the remainder of his collegiate eligibility, he owed the University exclusivity and good faith in attempting to renegotiate such terms.

32. The Agreement defines an act of "Transfer" as either (1) Sorsby's signaling or indicating that he "intends to transfer to another university" or (2) when Sorsby "otherwise cease[s] to be enrolled as a student at" the University.

7

33. Under the Agreement, "such transfer would constitute a breach of [Sorsby's] obligations to the University," if occurring during the Term. Sorsby expressly agreed that such a breach would result in "ongoing substantial harm to the University that would be difficult, at present [as of July 1, 2025], to calculate."

34. Again, the Agreement was signed on prospect before the 2025 season, before Sorsby had achieved substantial recognition and visibility but at a time when the University believed it could help build him into a valuable representative of the University.

35. Under the Agreement, Sorsby agreed that, if he caused a breach by transferring to another university before the end of the Term, he would pay the University a liquidated damages sum of $1,000,000 within 30 days of his Transfer. Specifically:

> Student Athlete acknowledges that the University has invested considerable time in recruiting Student Athlete in anticipation that Student Athlete will have a long, productive and successful career at the University, with increasing NIL value over time as the University's promotional efforts and Student Athlete's successes help to augment Student Athlete's recognition and visibility. Accordingly, in the event the Student Athlete intends to transfer to another university, … such Transfer would constitute a breach of Student Athlete's obligations to the University under this Agreement, resulting in ongoing substantial harm to the University that would be difficult, at present [anticipatorily, as of July 1, 2025], to calculate. Consequently, in the event of breach due to Transfer, Student Athlete agrees to pay the University, within thirty (30) days after any Transfer, as liquidated damages and not as a penalty, the sum of one million dollars ($1,000,000).

36. As of December 1, 2025, shortly following the completion of the University's 2025 football regular season schedule, Sorsby refused to engage in University football team activities even though the team's season was not complete, as the team had qualified for the January 2, 2026 Liberty Bowl.

37. Sorsby personally communicated to the University that he would not participate in any further practices or team activities, nor would he play in or attend the Liberty Bowl.

38. The University received Sorsby's completed Notification of Transfer form on December 15, 2025, effective January 2, 2026, to align with the opening of the NCAA Transfer Portal.

39. The University's Athletics Department had conversations with Sorsby's professional agent regarding Sorsby's future at the University.

40. The initial focus of those conversations revolved around the University's desire and attempt to have Sorsby remain enrolled at the University and participate as a member of the University's football team.

41. During those conversations, the University reminded Sorsby's professional sports agent that the Agreement's liquidated damages provision would apply were Sorsby to transfer to another university.

42. On January 4, 2026, ESPN reported that Sorsby personally told the network that he had committed to playing football for another university for the 2026 college football season.

43. On information and belief, from multiple media reports from reputable news organizations claiming multiple sources on the subject, Sorsby has executed an NIL agreement with another university that will pay him between $4 million and $6 million for the 2026 college football season.

44. At such value, it appears that the Agreement's good faith, estimated damages amount ($1 million) is significantly below market and below the value of the University's lost NIL value.

45. Upon information and belief, Sorsby already has permitted his new university to utilize his NIL. Sorsby permitted his new university to use his NIL on a large digital billboard in New York City's famed Times Square celebrating his commitment to his new university, in direct violation of his covenant to "not engage in any activity that would be contrary to or in conflict with

any marketing, advertising, publicizing, promotional or endorsement activity or agreement entered into by the University," as required under the Agreement.

46. Sorsby's transfer severely impacts the corresponding "value of the NIL Rights" that the University bargained and paid for, and which the Agreement acknowledges.

47. Furthermore, Sorsby's Transfer has left the University without the highly visible representative that the University bargained for.

48. Sorsby's Transfer and breach have destroyed the value of the University's bargained-and-paid-for NIL rights.

49. More than the prescribed 30 days have passed since Sorsby's Transfer as defined in the Agreement.

50. Yet, Sorsby did not pay the University the liquidated damages within 30 days after his Transfer, and he still has not paid this amount as of the date of this Complaint.

51. Sorsby's failure to pay the University the agreed-upon liquidated damages within 30 days after his Transfer is a breach of the Agreement.

52. Sorsby's representative advised that Sorsby will not pay the University.

53. The University has suffered and will suffer irreparable harm and otherwise suffer damages as a result of Sorsby's actions.

54. Sorsby's actions are intentional and willful.

55. The University fulfilled all material terms under the Agreement prior to Sorsby's breach.

## Count I: Breach of Contract

56. All preceding paragraphs are incorporated by reference.

57. The Agreement is a valid and binding contract.

58. The University performed its obligations under the Agreement through the date of Sorsby's breach.

59. The Agreement, including its liquidated damages and NIL rights license provisions, is binding on Sorsby and the University.

60. Sorsby has breached the Agreement by, among other things, failing to engage in football activities prior to his Transfer, transferring to another university, failing to negotiate exclusively and in good faith with the University prior to doing so, and by utilizing his NIL rights to publicize another university.

61. Sorsby has further breached the Agreement by failing to pay his agreed-upon liquidated damages by his agreed-upon date, which was 30 days after his Transfer.

62. As of the date of this Complaint, Sorsby has furnished no payment to the University.

63. As a result of Sorsby's breaches of the Agreement, the University has sustained substantial damages in an amount in excess of $1,000,000.

64. By virtue of the Agreement, the University is entitled to recovery of damages.

WHEREFORE, the University respectfully requests the following relief against Sorsby as follows:

a. Entry of judgment in favor of the University on the University's Complaint;

b. Entry of judgment requiring the full and prompt payment of the liquidated damages pursuant to the terms of the Agreement;

c. Entry of judgment requiring the full and prompt payment of all other damages caused by Sorsby's breach of the Agreement;

d. Entry of judgment requiring the full and prompt payment of the University's attorney fees and costs associated with this action;

e. Entry of judgment requiring the full and prompt payment of prejudgment and post judgment interest on all amounts due; and

f. All other just and proper relief.

### JURY TRIAL DEMANDED

Plaintiff the University of Cincinnati requests trial by jury.

Dated: February 25, 2026     Respectfully submitted,

*/s/ David DeVillers*
David DeVillers (Ohio No. 0059456)
BARNES & THORNBURG LLP
41 South High Street, Suite 3300
Columbus, Ohio 43215
Tel: (614) 628-0096 | Fax: (614) 628-1433
David.DeVillers@btlaw.com

Christopher J. Bayh (Ohio No. 0101638*)*
BARNES & THORNBURG LLP
11 S. Meridian Street
Indianapolis, Indiana 46032
Tel: (317) 236-1313 | Fax: (317) 231-7433
Chris.Bayh@btlaw.com

*Counsel for the University of Cincinnati*