UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNIVERSITY OF CINCINNATI, | : | |
| | : | Case No. 1:26-cv-00200 |
| Plaintiff, | : | |
| v. | : | Judge Michael R. Barrett |
| | : | |
| BRENDAN SORSBY, | : | Magistrate Stephanie K. Bowman |
| | : | |
| Defendant. | : | |

## DEFENDANT BRENDAN SORSBY'S MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Brendan Sorsby ("Defendant" or "Sorsby") requests that the Court enter an order dismissing the claims for liquidated damages and attorney's fees alleged in the Complaint for Damages (Doc. 1) of Plaintiff University of Cincinnati ("Plaintiff" or "UC") for failing to state a claim upon which relief can be granted. Defendant submits the attached Memorandum in Support of this Motion.

Dated: April 27, 2026                    Respectfully submitted,

/s/ Joseph J. Braun
Joseph J. Braun (Ohio Bar. No. 0069757)
Richard S. Wayne (Ohio Bar. No. 0022390)
STRAUSS TROY CO., LPA
150 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-2120
Facsimile: (513) 241-8259
E-mail: *jjbraun@strausstroy.com*
E-mail: *rswayne@strausstroy.com*
*Attorneys for Defendant Brendan Sorsby*

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### I. INTRODUCTION

The University of Cincinnati filed this action to garner a news headline that it was going to punish a former star athlete who dared to exercise his right to leave the school by forcing him to pay UC $1 million. However, in doing this, UC demonstrated that the claim is nothing more than an unreasonable penalty that is unlawful under Ohio law.

Plaintiff UC filed this case against Defendant Sorsby alleging the breach of a contract that allows UC to use Mr. Sorsby's name, image, and likeness ("NIL"). Doc. 1, ¶¶ 1, 56–64. However, despite its name, the NIL contract is actually an employment agreement that provides for payments to Mr. Sorsby for his performance as a quarterback, and UC's claims for $1 million in liquidated damages and attorney's fees are an unreasonable penalty. *Id.* at ¶ 2. When a claim for liquidated damages is shown to be an unreasonable penalty it is invalid as a matter of law. *Demczyk v. Mutual Life Ins. Co.*, 126 F.3d 823, 829 (6th Cir. 1997).

UC's claim for liquidated damages is unenforceable under Ohio law because "the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach," not to impose an "inequitable and unrealistic . . . penalty." *Demczyk*, 126 F.3d at 828. UC's alleged loss relative to Mr. Sorsby's NIL was *de minimis*, between $2,500 and $10,000. Ohio Rev. Code § 2741.07(A)(1)(b). Compared to the $875,800 that Mr. Sorsby received for his performance under the agreement, UC's demand for $1 million is exposed as nothing more than an unreasonable and disproportionate penalty. The parties' contractual intent to pay Mr. Sorsby for playing football was fully realized, and UC's attempt to now unlawfully penalize Mr. Sorsby for exercising his transfer right under the NCAA's rules and UC's efforts to discourage and threaten other players from doing the same thing is invalid as a matter of law. *See Noble v. Krizman*

1

*Enters.*, 692 F. App'x 256, 267 (6th Cir. 2017) (stating the elements of liquidated damages).

UC's claim for attorney's fees is also invalid under Ohio law, which requires attorney's fees to be based on a contract provision, an applicable statute, or bad faith. *Marrow v. SSOE, Inc.*, 599 F. Supp. 3d 593, 604 (N.D. Ohio 20220). UC fails to plead any of these requirements, nor could it do so. *See* Doc. 1. Therefore, UC's claim for attorney's fees should also be dismissed.

## II. BACKGROUND FACTS

Mr. Sorsby is a 6'3", 235-pound student-athlete from Denton, Texas. He is a highly rated college quarterback. For his first two college seasons in 2022 and 2023, he played for Indiana University, appearing in 10 total games. Looking for a fresh start after a coaching change, Mr. Sorsby exercised his right to transfer to a new school after the 2023 season. UC and Indiana University are both member institutions of the National Collegiate Athletic Association (the "NCAA"). Mr. Sorsby entered the NCAA's transfer portal, which streamlines the administrative process for student-athlete transfers between NCAA schools.

Mr. Sorsby officially transferred from Indiana to UC in December 2023 where he was named as the starting quarterback for UC. Sorsby played 11 games for UC in the 2024 season, and 12 games in 2025 season, achieving outstanding results in both campaigns.

Before the start of the 2025 season, UC and Mr. Sorsby entered into a written contract that became effective on July 1, 2025, with a term of 18 months (until December 15, 2026) for two football seasons (the "Agreement").[1] Doc. 1, ¶¶ 1, 20. The Agreement purports to be a license to use Mr. Sorsby's NIL for "promotional materials and activities," "positive publicity and goodwill," and to elevate Mr. Sorsby "as a [UC] representative." *Id.* at ¶ 1.

---

[1] The parties will enter into a Protective Order, subject to the Court's approval, which will provide for the filing of a complete copy of the Agreement under seal because of the confidentiality restrictions contained in the Agreement.

2

The Agreement was only possible because of the June 6, 2025 court order granting a class-action settlement in *In re College Athlete NIL Litigation*, 803 F. Supp.3d 959, 969 (N.D. Cal. 2025). Following that order, the NCAA permitted member schools to <u>directly pay</u> student-athletes for using their names, images, and likenesses. Doc. 1 ¶ 17. The results were "ground-breaking changes in NCAA rules that govern student-athlete compensation, which would enable NCAA schools to share their athletic revenues with Division I college student-athletes for the first time in the history of the NCAA . . . ." *In re Coll. Athlete NIL Litig.*, 803 F. Supp.3d at 969.  Since 2021 student-athletes have been able to profit from their NIL. *Tennessee v. NCAA*, 718 F. Supp. 3d 756, 759 (E.D. Tenn. 2024). Initially, NIL agreements were not entered into directly with the schools, but rather with third parties associated with the universities where the athletes played. The ground-breaking change that occurred in June 2025 allowed schools to pay student-athletes directly as a means of "shar[ing] their athletic revenues." *In re Coll. Athlete NIL Litig.*, 803 F. Supp.3d at 969. Thus, the Agreement at issue in this case was entered into between UC and Mr. Sorsby. Doc. 1 ¶ 17. The monthly amounts UC paid Mr. Sorsby were based on the "$20 million per school in the 2025-26 school year" that was available for revenue sharing under the terms of the class-action settlement. *In re Coll. Athlete NIL Litig.*, 803 F. Supp.3d at 975.

However, the entire basis of the Agreement is a legal fiction because Mr. Sorby's NIL has little actual value to UC. Mr. Sorsby's real value to UC is as a football player. The Agreement is nothing more than a pay-for-play employment contract. It is a way for UC to pay Mr. Sorsby for his on-field performance, but in purported conformance with the NCAA's current rules. The structure, terms, restrictions, and payments provided in  the Agreement make this clear. The intent of the Agreement was to incentivize Mr. Sorby's attendance at UC and reward him for playing football. Now that Mr. Sorby has exercised his right to transfer to another school, UC is trying to

3

punish Mr. Sorsby, and selectively send a chilling message to other student-athletes.[2]

On December 15, 2025, with one year of eligibility remaining to play football under the NCAA's rules, Mr. Sorsby filed formal paperwork with UC to enter the NCAA transfer portal and move to another school. Doc. 1, ¶ 4. A student-athlete may not enter the transfer portal unilaterally. Mr. Sorsby was required to inform UC of his intent to transfer, and UC was then tasked with submitting Mr. Sorsby's name into the transfer portal. As a result, UC was fully aware of Mr. Sorsby's decision and that it would need to find a new quarterback for the 2026 season. In fact, Mr. Sorsby coordinated his expected departure with UC's coaches and officials. He even assisted UC in recruiting a replacement quarterback, who came to UC via the transfer portal, just as Mr. Sorsby left. Mr. Sorsby and UC parted on good terms in a mutually agreeable manner with no recriminations and the replacement quarterback is actually living in Mr. Sorsby's old apartment.

UC did try to convince Mr. Sorsby to stay. Doc. 1, ¶¶ 39, 40. UC used the $1 million liquidated-damages clause in the Agreement to attempt to dissuade him from transferring. *Id.* at ¶ 41. UC offered to waive the $1 million if he entered the NFL Draft rather than transfer to another school. However, UC has no power to ignore the NCAA's transfer rules, which allow Mr. Sorsby to transfer and play football at a new school for his final year of eligibility. UC only paid Mr. Sorsby $875,800 in monthly payments under the Agreement for the one season that he fully completed. This alone makes UC's attempt to now try to collect $1 million from Mr. Sorsby a penalty and invalid as a matter of law as it is more money than he was paid by UC under the Agreement.

---

[2]     While UC filed this punitive action against Mr. Sorsby, it has intentionally determined not to pursue claims against other UC football players such as a wide receiver who entered the transfer portal at the same time as Mr. Sorsby and left to attend the University of Missouri. On information and belief, that player had an NIL agreement with UC and UC decided not to enforce the agreement despite the fact that it was identical in language to Mr. Sorsby's agreement.

Mr. Sorsby officially entered the NCAA transfer portal on January 2, 2026. Doc. 1, ¶ 5. Almost immediately thereafter he transferred to Texas Tech, a rival school to UC within the Big 12 Conference, and he signed a new NIL agreement with Texas Tech. Doc. 1, ¶ 5. The Texas Tech Red Raiders football team went 12-1 in the 2025 season and is considered to be a national championship contender for the 2026 season. Experts predict that Mr. Sorsby could be a top-tier quarterback prospect in the 2027 NFL Draft.

When Mr. Sorsby left, UC graciously thanked him for his time at UC and wished him success. However, despite inducing him to do so, UC now claims that Mr. Sorsby's transfer was a breach of the Agreement, and that Mr. Sorsby owes UC a disproportionate penalty of $1 million in liquidated damage and attorney's fees as a result. Doc, 1, ¶¶ 1, 56–64.  Against this backdrop, UC's damage claims are invalid as a matter of law, and should be dismissed.

## III.    ARGUMENT

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true and draw all reasonable inferences in favor of the plaintiff," *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008), UC's damage claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). "Threadbare recitals . . . supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). UC's "naked assertion[s]" about liquidated damages and attorney's fees fail to state a claim and should be dismissed. *Twombly*, 550 U.S. at 555, 557.

### A.    UC's request for $1 million in liquidated damages is invalid under Ohio law.

UC's claim for $1 million in liquidated damages is unenforceable because UC has failed to plausibly allege any of the three elements required to establish liquidated damages. *See Noble*

5

*v. Krizman Enters.*, 692 F. App'x 256, 267 (6th Cir. 2017). First, UC's $1 million demand is invalid because the actual value of Mr. Sorsby's NIL is not uncertain or difficult to prove. Rather, the value is *de minimis*, worth between $2,500 and $10,000. Ohio Rev. Code § 2741.07(A)(1)(b). Second, UC's $1 million demand is unreasonable and disproportionate compared to the $875,800 UC paid Mr. Sorsby, which itself is grossly unfair given the "*billions* of dollars in revenues for colleges every year" that NCAA student-athletes generate. *NCAA v. Alston*, 594 U.S. 69, 110 (2021) (Kavanaugh, J., concurring). Third, the parties' intent under the Agreement was to pay Mr. Sorsby to play football, but to do so in compliance with the NCAA's class-action settlement. That intent was fulfilled. UC's attempt to now penalize Mr. Sorsby for exercising his transfer right and threaten other players from doing the same is invalid as a matter of law.

UC's liquidated-damages clause states as follows:

> Student Athlete [Mr. Sorsby] acknowledges that the University [UC] has invested considerable time in recruiting Student Athlete in anticipation that Student Athlete will have a long, productive and successful career at the University, with increasing NIL value over time as the University's promotional efforts and Student Athlete's successes help to augment Student Athlete's recognition and visibility. Accordingly, in the event the Student Athlete intends to transfer to another university, whether such university is a member institution of the Conference or a different NCAA conference, or to otherwise cease to be enrolled as a student at the University (a "Transfer"), such Transfer would constitute a breach of Student Athlete's obligations to the University under this Agreement, resulting in ongoing substantial harm to the University that would be difficult, at present, to calculate. Consequently, in the event of breach due to a Transfer, Student Athlete agrees to pay the University, within thirty (30) days after any Transfer, as liquidated damages and not as a penalty, the sum of one million dollars ($1,000,000). Provided that Student Athlete timely notifies the University of the Transfer pursuant to Subsection 2(b), and timely pays the above liquidated damages, the University agrees not to seek additional damages from Student-Athlete relating to the Transfer. This provision should be interpreted consistent with and to the broadest extent permitted by law.

6

Agreement § 12(f). This clause is "governed by the laws of the state of Ohio." Agreement § 19.[3]

UC must plausibly allege all four elements of breach of contract. *Duff v. Centene Corp.*, 565 F. Supp. 3d 1004, 1015 (S.D. Ohio 2021). This includes "damage as a result of the breach." *Id.* at 1020 (*citing Logsdon v. Ohio N. Univ.*, 587 N.E.2d 942, 946–47 (Ohio Ct. App. 1990)). However, "'[d]amages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach.'" *Id.* at 1015 (*quoting Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996)). "Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy." *Demczyk v. Mutual Life Ins. Co.*, 126 F.3d 823, 828 (6th Cir. 1997) (internal quotations omitted) (*quoting Lake Ridge Academy v. Carney*, 613 N.E.2d 183, 187 (Ohio 1993)). Instead, "the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach." *Id.* (*quoting Lake Ridge Academy*, 613 N.E.2d at 187). Punitive damages are therefore not recoverable. *Id.* Thus, any penalty "designed to coerce performance by punishing nonperformance" or disconnected from the actual loss suffered is unenforceable. *Id.*

Contracting parties may provide for liquidated damages in certain circumstances. *Demczyk*, 126 F.3d at 828–29. However, because reasonable compensation for actual damage is the only legitimate objective, "where the amount specified is manifestly inequitable and unrealistic, courts

---

[3] The Agreement also states that "[j]urisdiction and venue for any claim arising out of this Agreement shall be in the Court of Claims in the State of Ohio." Agreement § 19. UC has ignored this provision of the Agreement in an attempt to claim sovereign immunity over the counterclaim it knows is coming. As it has argued in the past, UC will contend that "counterclaims must be dismissed because [UC] is entitled to sovereign immunity as an arm of the state and, therefore, the counterclaims are barred by the Eleventh Amendment." *Univ. of Cincinnati v. Red Cedar Solutions Group, Inc.*, No. 1:14-cv-458, 2015 U.S. Dist. LEXIS 20739, at *4 (S.D. Ohio Feb. 20, 2015). This argument should fail because "[b]y voluntarily initiating this action in federal court on the basis of diversity jurisdiction and raising state law contract claims against [the Defendant], [UC] consented to this Court's judicial determinations on both its claims and [the Defendant's] compulsory counterclaims." *Id.* at *10 (*citing Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002)), and *Clark v. Barnard*, 108 U.S. 436, 447 (1883) ("[M]ore than a century ago this Court indicated that a State's voluntary appearance in federal court amounted to a waiver of its Eleventh Amendment immunity.")).

will ordinarily regard it as a penalty." *Id.* at 829 (*quoting Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 394 (Ohio 1984)). A contract's bare statement that liquidated damages is not a penalty "is by no means conclusive or controlling." *Samson Sales*, 465 N.E.2d at 394.

The validity of UC's liquidated-damages clause is a question of law. *Lake Ridge Academy*, 613 N.E.2d at 380; *accord Kehoe Component Sales, Inc. v. Best Lighting Prods.*, 933 F. Supp. 2d 974, 998 (S.D. Ohio 2013). Resolving this question "depends upon the operative facts and circumstances surrounding each particular case." *Samson Sales*, 465 N.E.2d at 394. "'[I]t is necessary to look to the whole instrument, its subject-matter, the ease or difficulty of measuring the breach in damages, and the amount of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the probable consequences of the breach, and also to the intent of the parties ascertained from the instrument itself in the light of the particular facts surrounding the making and execution of the contract.'" *Lake Ridge Academy*, 613 N.E.2d at 381–82 (*quoting Jones v. Stevens*, 146 N.E. 894 (Ohio 1925)).

Liquidated damages are only enforceable if three requirements are met: (1) the amount of actual damages must be uncertain and difficult to prove; (2) the amount of stipulated damages must be reasonable and proportionate to the contract as a whole; and (3) the parties' intent to stipulate to damages must be clear and unambiguous. *B&G Props. Ltd. P'ship v. OfficeMax, Inc.*, 3 N.E.3d 774, 785 (Ohio Ct. App. 2013); *accord Noble v. Krizman Enters.*, 692 F. App'x 256, 267 (6th Cir. 2017) (*quoting Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 394 (Ohio 1984)). UC's claim for liquidated damage fails under each of these three requirements.

### 1. UC's request for $1 million liquidated damages is invalid because actual damages are *de minimis*, not uncertain or difficult to prove.

The first element UC must plead is that actual damage is uncertain and difficult to prove. *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394; *B&G Props. Ltd. P'ship*, 3 N.E.3d

8

at 785. UC has not met this burden because the value of Mr. Sorsby's NIL to UC is *de minimis* and easily calculable. Mr. Sorsby's NIL has minimal value to UC because UC only acquired a "non-exclusive" right, the value of "broadcast NIL" is excluded, and UC is not obligated to use or develop the NIL rights. Agreement §§ 3(a), (d) & (8). The plain language of the liquidated-damages clause does nothing to establish that UC will suffer any loss. There is only a *de minimis* value in UC being associated with or endorsed by Mr. Sorsby. *See Roe v. Amazon.com*, 714 F. App'x 565, 568 (6th Cir. 2017). Moreover, the statutory value of NIL in Ohio is between $2,500 and $10,000 as a matter of law. Ohio Rev. Code § 2741.07(A)(1)(b). Because UC's damages are not uncertain and difficult to prove, its demand for $1 million in liquidated damages should be dismissed.

The Agreement is premised on licensing Mr. Sorsby's NIL rights not because those rights are valuable, but because that was the only way UC could pay Mr. Sorsby to play football in compliance with the NCAA's rules. On June 21, 2021, the U.S. Supreme Court stated that "the NCAA and its member colleges are suppressing the pay of student athletes who collectively generate *billions* of dollars in revenues for colleges every year." *NCAA v. Alston*, 594 U.S. 69, 110 (2021) (Kavanaugh, J., concurring). Thereafter, the NCAA implemented a policy permitting student-athletes to utilize their NIL for commercial purposes while preserving their eligibility to compete in NCAA athletics. Then on June 6, 2025, the court in *In re College Athlete NIL Litigation*, 803 F. Supp.3d 959, 969 (N.D. Cal. 2025), approved a class settlement that allowed NCAA schools to pay student-athletes directly, but only for their NIL rights. This settlement allows NCAA schools to pay student-athletes "$20 million per school in the 2025-26 school year," with increasing amounts each year thereafter, while preserving the NCAA's objection over student athletes becoming employees. *In re Coll. Athlete NIL Litig.*, 803 F. Supp.3d at 975.

UC took advantage of this NCAA rule change to incentivize Mr. Sorsby, and others, to play football for UC. *See* Agreement §§ 9 & 12(d) (specifically stating that the Agreement is subject to this court's settlement order). However, the NCAA only allows UC to pay Mr. Sorsby based on NIL rights. In other words, the Agreement licenses Mr. Sorsby's NIL rights not because those rights are valuable, but because that is the only way the NCAA allows UC to pay Mr. Sorsby directly for playing football. In reality, Mr. Sorsby's NIL rights have very little monetary value.

This *de minimis* value is demonstrated by the fact that UC only acquired "non-exclusive" rights. Agreement § 3(a). The Agreement does not forbid Mr. Sorsby from licensing his NIL rights to someone else. *See id.* Any value to UC is therefore limited from the beginning.

The value of Mr. Sorsby's NIL is further limited because broadcast NIL is expressly excluded from the Agreement. Agreement § 3(d). As the Agreement states, "broadcast NIL" is the right to broadcast a "Student Athlete's college athletics games and competitive events." *Id.* This relates to Ohio NIL law mandating that the use of "an individual's persona in connection with any . . . sports broadcast . . . does not constitute a use for which consent is required . . . ." Ohio Rev. Code § 2741.02(D)(1). So, the right to broadcast the very thing that makes Mr. Sorsby's association with UC valuable—playing football—is not included within the Agreement. This also greatly limits any value of Mr. Sorsby's NIL to UC.

The value of Mr. Sorsby's NIL is further limited because UC is required to pay Mr. Sorsby under the Agreement even though UC is "not obligated to use or exploit the NIL Rights" of Mr. Sorsby in any respect. Agreement § 8. If the NIL rights had value, both parties should want to use and develop them and increase their value over time. However, the Agreement does not reflect this. Instead, UC is paying Mr. Sorsby to play football, not for any actual value of his NIL to UC, which is worth a *de minimis* amount.

10

The liquidated-damages clause itself also makes no attempt to connect the $1 million that UC demands to any actual damage based on the value of Mr. Sorsby's NIL. Agreement § 12(f). The only suggestions of damage in the liquidated-damages clause are that UC "invested considerable time in recruiting" Mr. Sorsby, and that Mr. Sorsby's NIL will have "increasing . . . value over time." *Id.* These unsupported statements do nothing to establish any value for Mr. Sorsby's NIL because the cost of recruiting Mr. Sorsby has nothing to do with his NIL. UC incurs recruiting costs for every football player regardless of any NIL value. Even if the value of Mr. Sorsby's NIL does increase over time, which the Agreement does not reflect, that does not establish any actual value or loss to UC. As stated above, caselaw mandates that "the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach." *Demczyk*, 126 F.3d at 828. Moreover, liquidated damage is unenforceable if "its principal object is not compensation for the losses suffered." *Id.* However, UC's liquidated-damages clause makes no attempt to establish that it will suffer a loss for not being able to use Mr. Sorsby's NIL, especially when UC only acquired a "non-exclusive" right, the value of "broadcast NIL" is excluded, and UC is not obligated to use or develop his NIL rights in the first place. Agreement §§ 3(a), (d) & (8). The liquidated-damages clause does nothing to satisfy the requirement of proving "compensation for the losses suffered." *Demczyk*, 126 F.3d at 828. Instead, the $1 million that UC demands is an arbitrary and factually baseless number chosen to look intimidating.

The truth is that Mr. Sorsby's NIL is worth a *de minimis* amount to UC. To prove otherwise UC would have to show that merely being associated with or endorsed by Mr. Sorsby creates value for UC. *See Roe v. Amazon.com*, 714 F. App'x 565, 568 (6th Cir. 2017) (stating that a plaintiff with a right-to-publicity claim under Ohio law must at the very least "'demonstrate that there is value in associating an item of commerce with [their] identity'"). Merely being associated with or

11

endorsed by Mr. Sorsby does not benefit UC in any significant respect, especially compared to the NIL value of the quarterback who replaced him, the $875,800 that UC paid Mr. Sorsby, and the $1 million penalty that UC is now attempting to recover. Rather, UC is saving money by paying a replacement quarterback less money. Compared to the *de minimis* value of Mr. Sorsby's NIL, UC's $1 million demand does not "correspond to injuries resulting from the breach." *Duff*, 565 F. Supp. 3d at 1015.

The value of Mr. Sorsby's NIL is established in the statutes that create a claim for unauthorized use of an "individual's persona for a commercial purpose." Ohio Rev. Code § 2741.02(A). A violation of this right under Ohio law can bring actual damages, or in lieu thereof, "statutory damages in the amount of at least two thousand five hundred dollars and not more than ten thousand dollars." Ohio Rev. Code § 2741.07(A)(1)(a) & (b). The value of Mr. Sorsby's NIL is therefore between $2,500 and $10,000 as a matter of law. *Id.*; *see also James v. Bob Ross Buick, Inc.*, 855 N.E.2d 119, 344–45 (Ohio Ct. App. 2006) (holding that "a plaintiff may seek to recover nominal damages for claims of misappropriation of the plaintiff's name or likeness").

The result is that UC's damage claim fails as a matter of law to satisfy the requirement that damages are "uncertain as to amount and difficult of proof." *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394; *accord B&G Props. Ltd. P'ship*, 3 N.E.3d at 785. Mr. Sorsby's NIL has very little value to UC given that UC only acquired a "non-exclusive" right, the value of "broadcast NIL" is excluded, and UC is not even obligated to use Mr. Sorsby's NIL. Agreement §§ 3(a), (d) & (8). The plain language of the liquidated-damages clause itself does not establish that UC will suffer any loss. There is *de minimis* value in UC being associated with or endorsed by Mr. Sorsby. *See Roe*, 714 F. App'x at 568. And the statutory value of NIL when used for commercial purposes is only between $2,500 and $10,000. Ohio Rev. Code § 2741.07(A)(1)(b). Because UC's damages

are not "uncertain as to amount and difficult of proof," the $1 million in liquidated damages is unenforceable as a matter of law. *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394; *accord B&G Props. Ltd. P'ship*, 3 N.E.3d at 785. UC's demand for $1 million in liquidated damages should therefore be dismissed.

> **2.** **UC's liquidated damage claim is invalid because $1 million is not reasonable or proportionate to the contract as a whole or to the $875,800 that Mr. Sorsby earned.**

The facts present in this case belie a claim against Sorsby for liquidated damages. The second element required to support a valid claim for liquidated damages requires UC's $1 million demand to be "reasonable and proportionate to the contract as a whole." *B&G Props. Ltd. P'ship*, 3 N.E.3d at 785. UC must plausibly allege that the contract "is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties." *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394. UC's pleading does not meet this burden because the facts tell a different story. Compared to the $875,800 that UC paid and the "*billions* of dollars in revenues for colleges every year" that student-athletes generate, *Alston*, 594 U.S. at 110, UC's demand for $1 million is unreasonable. UC's demand is also unconscionable because it is triggered by Mr. Sorsby exercising the inalienable right every student athlete has under the NCAA's rules to transfer to another school. In choosing to do this, UC's $1 million demand is not "reasonable and proportionate to the contract as a whole." *B&G Props. Ltd. P'ship*, 3 N.E.3d at 785.

UC paid Mr. Sorsby $875,800 under the Agreement. Compare this to fact that "the NCAA and its member colleges are suppressing the pay of student athletes who collectively generate *billions* of dollars in revenues for colleges every year." *Alston*, 594 U.S. at 110. Mr. Sorsby was already grossly underpaid in comparison to the money that UC's football program

earns, with or without Mr. Sorsby's NIL. Forcing Mr. Sorsby to pay $1 million to UC for a contract that only paid him $875,800, before taxes and all his other expenses, would be "manifestly unconscionable, unreasonable, and disproportionate." *Noble*, 692 F. App'x at 267; *see also Lake Ridge Academy*, 613 N.E.2d at 187 (stating that a remedy is punitive and invalid if "disproportionate to the damage which could have been anticipated"). UC's demand for Mr. Sorsby to pay more than 100% of the value of the contract is unenforceable as a matter of law. *See Noble*, 692 F. App'x at 267 (stating that "[t]wenty percent is not unreasonably large").

In an attempt to make its $1 million demand appear more reasonable, UC alleges that Mr. Sorsby's contract with Texas Tech will pay him "between $4 million and $6 million." Doc. 1, ¶¶ 5, 43. UC then uses this unsupported averment to contend that its $1 million demand is "below market and below the value of [UC's] lost NIL value." *Id.* at ¶ 44. The facts will show otherwise and demonstrate that the $1 million is unreasonable compared to the $875,800 he earned. Moreover, even if Mr. Sorsby were to be paid more at Texas Tech it will be to play football—not for an increased value of his NIL.

UC also does not plead any damage from losing Mr. Sorsby's labor as a quarterback, because it did not suffer any such damage. *See* Doc. 1; *see also Eggert v. Meritain Health, Inc.*, 428 F. App'x 558, 563 (6th Cir. 2011) ("'The damages awarded for a breach of contract should place the injured party in as good a position as it would have been in but for the breach.'"). Any claim about the value of Mr. Sorsby's labor would violate the NCAA's rule that student-athletes may only be paid based on NIL rights, not based on pay-for-play employment. Doc. 1, ¶ 17; *In re College Athlete NIL Litigation*, 803 F. Supp.3d at 969. Any such claim about the value of Mr. Sorsby's labor would also be implausible given UC's roster depth at that position. UC has multiple options for starting quarterbacks. In fact, two prospects recently came to UC through the transfer

14

portal, the same way Mr. Sorsby left. Mr. Sorsby even helped recruit UC's expected starter for next season before he left, and he is living in Mr. Sorsby's old apartment. Any attempt to conflate the value of Mr. Sorsby's labor as a football player is invalid given that the Agreement is based solely on the value of Mr. Sorsby's NIL.

UC's claim for $1 million from Mr. Sorsby is further "manifestly unconscionable, unreasonable, and disproportionate" given that it is based on Mr. Sorsby's inalienable right to transfer to another school. *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394; Agreement § 12(f). Under the plain language of the Agreement, UC's $1 million demand is triggered when "the Student Athlete intends to transfer to another university," and "such Transfer would constitute a breach." Agreement § 12(f). But as an NCAA member, UC has no power to forbid Mr. Sorsby from exercising his transfer rights in the first place. Penalizing Mr. Sorsby for doing something that every NCAA student-athlete has the inalienable right to do is unconscionable and unreasonable. This is especially true because UC was fully informed of Mr. Sorsby's desire to transfer beforehand, in compliance with the NCAA's rules, UC's coaches and officials cooperated with Mr. Sorsby in effectuating the transfer, and UC even told Mr. Sorsby that if he instead entered the NFL Draft it would not seek liquidated damages. UC is suing Mr. Sorsby because he dared to exercise his right to transfer, which UC has no power to restrict in the first place. UC's pleading of $1 million in liquidated damages is invalid given these facts.

UC has failed to plausibly allege that its $1 million demand is "reasonable and proportionate to the contract as a whole." *B&G Props. Ltd. P'ship*, 3 N.E.3d at 785. UC only paid Mr. Sorsby $875,800, and that was before he paid taxes and expenses. The $875,800 was unfair in light of the fact that "the NCAA and its member colleges are suppressing the pay of student athletes who collectively generate *billions* of dollars in revenues for colleges every year." *Alston*, 594 U.S.

15

at 110. UC cannot claim damages based on the value of Mr. Sorsby's labor as a quarterback—only the value of NIL is at issue under the Agreement and the NCAA's rules. And it is unconscionable for UC to trigger its $1 million demand on Mr. Sorsby's inalienable right to transfer to another school. Because UC's demand for $1 million is "manifestly unconscionable, unreasonable, and disproportionate" in light of the contract as a whole, UC's liquidated-damages claim should be dismissed. *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394.

### 3. UC's request for $1 million in liquidated damages is invalid because the parties' only shared intent was to pay Mr. Sorsby to play football for UC, not to penalize him for transferring and threaten other players from doing the same thing.

The third element of liquidated damages mandates that "the parties' intent to stipulate to damages must be clear and unambiguous." *B&G Props. Ltd. P'ship*, 3 N.E.3d at 785. UC must plausibly plead that "it was the intention of the parties [both parties, not just one] that damages in the amount stated should follow breach thereof." *Noble*, 692 F. App'x at 267; *Samson Sales*, 465 N.E.2d at 394. The parties' joint intent in the Agreement was to pay Mr. Sorsby to play football in compliance with the NCAA's rules. UC got what it paid for. UC's punitive intent to penalize Mr. Sorsby for transferring, and to use that penalty as a threat against other UC student-athletes who do the same, is invalid as a matter of law.

The overriding flaws with the Agreement are that it is a pay-for-play employment contract, and the premise of paying for NIL rights is a weak legal fiction. As stated above, the parties entered into the Agreement to pay Mr. Sorsby for playing football for UC, but to do so within the NCAA's strict requirements. The only reason why the Agreement exists in the form it does is because of the NCAA's antitrust settlement, which is designed to share some of the billions of dollars in revenue illegally earned from the labor of student-athletes like Mr. Sorsby. *See In re College Athlete NIL Litigation*, 803 F. Supp.3d at 969. The Agreement would never have been based on

16

NIL rights in the first place if it were not for that class-action settlement.

The structure, terms, restrictions, and payments of the Agreement instead make it clear that it is a pay-for-play employment contract, and that the premise of licensing NIL rights is a legal fiction. In contrast to how the Agreement treats NIL rights—as a valueless afterthought, as analyzed above—the Agreement incentivized and paid Mr. Sorsby to play football. The Agreement is explicitly premised on Mr. Sorsby's status as a "collegiate athlete who is currently enrolled as a student at [UC]," and the maintenance of his status as being "eligible under NCAA Rules to participate in [UC's football] Program." Agreement § 7. The Agreement is therefore explicitly based on Mr. Sorsby's participation in UC's "Football athletic program" as a "material inducement" for the Agreement. *Id.* at pp.1, 5 & § 7. UC also reserved the right to terminate the Agreement based on Mr. Sorsby's "complete medical history," meeting "all physical fitness requirements of the [football] Program," and "being medically cleared to participate in the [football] Program's activities and competitions." Agreement § 12(a)(i). These provisions only matter for playing football, not for the use or value of Mr. Sorsby's NIL.

It is also no coincidence that the monthly payments to Mr. Sorsby under the Agreement approximately doubled during the football season. Agreement Sched. A. Further, the payments stopped as soon as Mr. Sorsby stopped playing football for UC. The structure, terms, restrictions, and payments of the Agreement establish that the intent of the Agreement was to pay Mr. Sorsby to play football, not to pay him for the value of his NIL. Mr. Sorsby satisfied that intent by completing the season of football that UC paid him to play.

Now that Mr. Sorby has exercised his right to transfer to another school, UC is trying to send a message to its other players. UC's coaches and officials believe that losing football players through the NCAA transfer portal makes it difficult to manage their rosters and compete

effectively. The transfer rules apply to every NCAA member school equally, but the belief is still correct—the NCAA's transfer rules make their jobs more difficult. So, UC is suing Mr. Sorsby in a high-profile case to dissuade other players from doing the same thing.

UC specifically structured its $1 million demand to be triggered by a transfer to another school. Agreement § 12(f). Trying to deprive Mr. Sorsby of his right to transfer, and then using him as an example to threaten other UC student-athletes away from doing the same thing, may have been UC's intent for the Agreement, but it was never Mr. Sorsby's intent. Rather, the intent of the parties—both parties together, not just UC's selfish intent—is clear: they intended to pay Mr. Sorsby to play football in compliance with the NCAA's rules. UC got what it paid for because Mr. Sorsby earned the monthly payments he received during the 2025 season by playing football, and UC stopped the payments when Mr. Sorsby left and was replaced. UC's current attempt to use Mr. Sorsby as a pawn to threaten other UC student-athletes away from transferring is a misuse of judicial resources that should not be condoned by this Court.

The result is that UC's $1 million damage allegation is invalid as a matter of law because the parties did not have a "clear and unambiguous" intent to impose that penalty for Mr. Sorsby exercising his inalienable right to transfer to another school. *B&G Props. Ltd. P'ship*, 3 N.E.3d at 785. Rather, the parties' only shared intent was to pay Mr. Sorsby to play football for UC, and that goal was achieved. UC's additional intent to cut off Mr. Sorsby's right to transfer and threaten other UC players away from doing the same was not shared by Mr. Sorsby and is improper as a matter of law. Mr. Sorsby's Motion to Dismiss should therefore be granted, and UC's claim for $1 million in liquidated damages should be dismissed with prejudice.

**B.** **UC is not entitled to an award of attorney's fees because UC fails to plead any applicable contract provision, statute, or bad faith.**

UC also demands payment of its "attorney fees . . . associated with this action." Doc. 1,

18

p.11, ¶ d. This demand invalid as a matter of law because it is unsupported by any contract provision, statute, or allegation of bad faith. *See id.*

The "American rule" applied in Ohio mandates that a prevailing party in a civil action may not recovery attorney fees as part of the costs of litigation. *Wilborn v. Bank One Corp.*, 906 N.E.2d 396, 400 (Ohio 2009). The only three exceptions are when attorney's fees are "'provided for by contract or statute or when the prevailing party proves bad faith.'" *Marrow v. SSOE, Inc.*, 599 F. Supp.3d 593, 604 (N.D. Ohio 2022) (*quoting Simpkins v. Grace Brethren Church*, 75 N.E.3d 122, 132 (Ohio 2016)). The pleadings demonstrate none of these exceptions apply.

There is no attorney-fee provision in the Agreement, and UC does not allege otherwise. *See* Doc. 1. There is therefore no contractual provision to apply in this case. *See Power & Tel. Supp. Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 933 (6th Cir. 2006) (stating that in determining an award of attorney's fees, "[t]he contractual language must be construed as written").

There is also no applicable statutory provision to justify an award of attorney fees under the Agreement. UC does not allege otherwise. *See* Doc. 1.

There is also no bad faith, in spite of UC's allegation that Mr. Sorsby's "actions are intentional and willful." Doc. 1, ¶ 54. This allegation is insufficient given the absence of any tort claim and that UC only pleads breach of contract. *See id.* at ¶¶ 56–64. "[I]ntent to breach an agreement does not demonstrate bad faith." *Marrow*, 599 F. Supp. 3d at 606 (*citing Strategy Group for Media, Inc. v. Lowden*, 2013 WL 1343614, 2013 Ohio App. LEXIS 1261, at *29–30 (Ohio Ct. App. Mar. 21, 2023) (holding that mere refusal to perform a contract is insufficient to demonstrate bad faith)). As stated above in relation to liquidated damages, there is no economic or other justification for punishing a promisor for breaching a contract. *Demczyk*, 126 F.3d at 828 (*quoting Lake Ridge Academy*, 613 N.E.2d at 187); *see also Wilborn*, 906 N.E.2d at 401 (providing that a

19

stipulation to pay attorney fees operates as a penalty). An "intentional and willful" breach of a contract does not constitute bad faith. Doc. 1, ¶ 54; *Marrow*, 599 F. Supp. 3d at 606.

UC also fails to plead that Mr. Sorsby entered into the Agreement "with the intent not to honor its terms," or based on "'vengefulness, or a desire to do the non-breaching party harm.'" *Marrow*, 599 F. Supp. 3d at 606 (*citing Hall v. Franz*, No. 19630, 2000 WL 670662, 2000 Ohio App. LEXIS 2186, at *21 (Ohio Ct. App. May 24, 2000), and *quoting Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-cv-399, 2015 WL5636897, 2015 U.S. Dist. LEXIS 129516, at *42 (S.D. Ohio Sept. 25, 2015)). As a matter of law, a mere breach of contract does not amount to the kind of dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive or ill will in the nature of fraud required to find bad faith. *Marrow*, 599 F. Supp. 3d at 607. UC's request for attorney's fees should therefore be dismissed, and Mr. Sorsby's motion should be granted.

## IV. CONCLUSION

UC's damage claims for $1 million in liquidated damages and attorney's fees are unenforceable as a matter of law. Mr. Sorsby therefore respectfully requests that UC's damage claims be dismissed with prejudice.

Dated: April 27, 2026

Respectfully submitted,

/s/ Joseph J. Braun
Joseph J. Braun (Ohio Bar. No. 0069757)
Richard S. Wayne (Ohio Bar. No. 0022390)
STRAUSS TROY CO., LPA
150 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-2120
Facsimile: (513) 241-8259
E-mail: *jjbraun@strausstroy.com*
E-mail: *rswayne@strausstroy.com*
*Attorneys for Defendant Brendan Sorsby*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 27th day of April 2026, a copy of the foregoing was filed using the Clerk of Court's CM/ECF filing system, which will send notification of such filing to all counsel of record.

/s/ Joseph J. Braun
Joseph J. Braun (0069757)

19492576_1