IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNIVERSITY OF CINCINNATI, | ) | |
| | ) | Case No. 1:26-cv-00200 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Michael R. Barrett |
| | ) | |
| BRENDAN SORSBY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF UNIVERSITY OF CINCINNATI'S BRIEF IN OPPOSITION TO
DEFENDANT BRENDAN SORSBY'S MOTION TO DISMISS**

David M. DeVillers (0059456)
Trial Attorney
BARNES & THORNBURG, LLP
41 South High Street, Suite 3300
Columbus, Ohio 43215
Telephone: (614) 628-1446
Facsimile: (614) 628-1443
DDeVillers@btlaw.com

Christopher J. Bayh, *pro hac vice*
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 231-7449
Facsimile: (317) 231-7433
Email: Chris.Bayh@btlaw.com

*Counsel for Plaintiff*

**INTRODUCTION**

The University of Cincinnati's ("University") Complaint articulates a straightforward breach of contract case.[1] Defendant Brendan Sorsby's Motion to Dismiss ("Motion") fails to set forth any legitimate basis to dismiss it.

As detailed in the Complaint, Sorsby signed a lucrative, 18-month name, image, and likeness ("NIL") licensing agreement ("Agreement") with the University. Under that Agreement, the University agreed to pay Sorsby multiple millions of dollars in exchange for the right to use his NIL for its own promotional purposes. In return, Sorsby promised that if he breached the Agreement by transferring to another institution, he would pay the University $1 million in liquidated damages. In doing so, Sorsby explicitly acknowledged the harm that his transfer would cause the University, and he agreed that these liquidated damages were a fair remedy. Sorsby then committed that exact breach, by transferring to another institution mid-term, to take an even more lucrative NIL deal.

Sorsby now seeks to avoid the consequences of his breaches of the Agreement and the promises he made to the University. He seeks dismissal of the Complaint, claiming that the liquidated damages clause in the Agreement is unenforceable because it is "an unreasonable and disproportionate penalty." Doc. 7, PAGEID # 26. Sorsby also contends that the Agreement was a contract "for playing football" and that it "unlawfully penalize[s] [him] for exercising his transfer right," making it "invalid as a matter of law." *Id*. In doing so, Sorsby relies entirely on new purported fact allegations from outside of the pleadings—facts which are wrong, as discovery will show.

The Motion should be denied as a matter of law and this case should proceed.

---

[1] While the University's Complaint states claims for actual damages, liquidated damages, and attorneys' fees, Sorsby's Motion only seeks dismissal of the liquidated damages and attorneys' fees claims.

1

**STATEMENT OF FACTS**

I.  **How NIL works: the *House* settlement authorizes NIL licensing agreements and does not create employment relationships.[2]**

The *House* antitrust litigation settlement and court order established the current NIL system in college athletics. The underlying class action lawsuits challenged National Collegiate Athletic Association ("NCAA") rules prohibiting student-athlete compensation. *See generally In re Coll. Athlete NIL Litig. ("House")*, 803 F. Supp. 3d 959, 969 (N.D. Cal. 2025). The *House* plaintiffs raised three types of compensation that they believed student-athletes should receive. First was payment from third parties for use of student-athlete name, image, and likeness—for example, if a commercial brand paid a student-athlete to endorse its product or appear in its commercials. *Id.* Second was compensation from their schools and conferences for use of their NIL, such as in university promotions. *Id.* Third was direct compensation from the universities to the student-athletes "for their athletic services," also known as "pay-for-play" employment. *Id.* at 969–72.

This litigation was resolved by a global settlement. *Id.* at 970–72. The centerpiece of the settlement was a framework by which the NCAA would permit universities to enter into licensing agreements to obtain rights to their student-athletes' NIL, for purposes of "institutional brand promotion," and pay student-athletes licensing fees in return. *See House*, No. 4:20-cv-03919, Doc. 958-1 at 59 (N.D. Cal. May 5, 2025). It also allowed third parties to pay to license student-athletes' NIL, such as through endorsements and ads. *Id.* at 60.

The settlement thus resolved the first and second prongs of the litigation, on university and third-party NIL licensing. But it specifically omitted, and granted no injunctive relief on, the

---

[2] As explained below, the Court should reject Sorsby's attempt to inject new facts, including those about the *House* settlement. Those facts are not only outside the pleadings, they are also wrong and misleading. The Court, in its discretion, may take judicial notice of the *House* proceedings. *U.S. ex rel. Antoon v. Cleveland Clinic Found.*, 978 F. Supp. 2d 880, 887 (S.D. Ohio 2013).

2

litigation's third prong, which argued that student-athletes should receive direct "pay-for-play" as university employees. *See generally id.* (providing no such relief); *see House*, 803 F. Supp. 3d at 997, 1009 (overruling related objections). To the contrary, the settlement expressly states that "the NCAA's and conferences' existing rules limiting the amount of compensation and benefits to Division I student-athletes may remain in effect." No. 4:20-cv-03919, Doc. 958-1 at 73.

Concurrently, the Ohio legislature permitted Ohio universities to "compensate a student-athlete for use of the student-athlete's [NIL]." Ohio Rev. Code § 3376.09. This compensation does not create an employment relationship. Ohio Rev. Code § 3376.11.

Since then, NCAA institutions have begun acquiring student-athletes' NIL rights and using them to create mutual benefit. *See*, *e.g.*, Agreement.

**II.     Sorsby signed an NIL licensing agreement with the University.**

Sorsby joined the University of Cincinnati Bearcats football program in the 2024 offseason. Doc. 1, Complaint ("Compl.") ¶ 14. He won and kept the starting quarterback job, starting all 12 games that season and gaining something of a national profile. *Id.* ¶¶ 14–15.

On July 1, 2025, Sorsby signed a contract titled "NIL License Agreement," granting the University license to use his NIL to represent and promote its brand for the 2025 and 2026 football seasons, in exchange for multiple millions in NIL licensing fees (the "Agreement"). Compl. ¶¶ 1, 19–21.[3] The Agreement details the purpose and parameters of the license, which enabled the University to use Sorsby's NIL to promote itself and drive revenue, thereby benefitting the University. *See* Agreement § 3 and 3(a) (NIL license granted "in connection with the marketing, advertising, publicizing, promoting and endorsing the University," including its "businesses,

---

[3] The Agreement is central to the University's breach-of-contract claim, and, thus, is part of the record for purposes of resolving Sorsby's Motion. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999). The parties agree that the Agreement should be, and will become, part of the record here upon the entry of a protective order, given the Agreement's confidentiality restrictions. Doc. 1, PAGEID # 5, n.1; Doc. 7, PAGEID # 27, n.1.

products and services" and "the design, manufacture, marketing, promotion, distribution, importation and sale of products and services"). The Agreement also required Sorsby's participation in achieving these objectives by undertaking "promotional assistance and support" to the University in the form of "attending marketing and promotional events," making radio and television appearances, and "engaging in social media and assisting with social media content." *Id.* § 3(c). The Agreement specifically states the parties' intent and understanding that it was not a "pay-for-play" arrangement. *Id.* § 10(f).

To protect the value of the promotion that the University would receive under the Agreement, Sorsby agreed to act and behave "in such a manner so as to protect and maintain the value of the NIL Rights" and not to "engage in any activity that would be contrary or conflicting with any marketing, advertising, publicizing, promotional or endorsement activity or agreement entered into by the University." Compl. ¶¶ 23–24; Agreement §§ 4(b), 7.

The term of the Agreement was to be through December 15, 2026, covering the final two football seasons of Sorsby's college eligibility. Compl. ¶¶ 19–21. In executing the Agreement, Sorsby expressly acknowledged "that the University has invested considerable time in recruiting [him] in anticipation that [he] will have a long, productive and successful career *at the University*[.]" *Id*. ¶¶ 25, 35 (emphasis added). The Agreement provided that the University would make regular NIL licensing payments to Sorsby throughout the term. *See* Agreement § 10 & Schedule A. It also reflected the parties' expectation that the value of Sorsby's NIL rights, while uncertain, would have "increasing [ ] value over time as the University's promotional efforts and [his] successes help to augment [his] recognition and visibility." *Id*. § 12(f); Compl. ¶¶ 26.

Recognizing that the value of Sorsby's NIL rights might increase even more steeply than projected, given the University's promotional efforts and Sorsby's anticipated successes, the

Agreement expressly contemplated a renegotiation process to address that eventuality: "[Sorsby] agrees to negotiate with the University, exclusively and in good faith, prior to the end of the Term, to enter into a renewed agreement for the University to continue to license [Sorsby's] NIL Rights." *Id*. § 2(c); Compl. ¶ 31. "Thus, if Sorsby wanted to renegotiate his NIL licensing payment, which covered the remainder of his collegiate eligibility, he owed the University exclusivity and good faith in attempting to renegotiate such terms." Compl. ¶ 31.

The University's ability to use Sorsby's NIL to promote its brand and football program was inherently tied to Sorsby's status as an eligible student-athlete enrolled at the University. If Sorsby were to lose NCAA eligibility, or to transfer to another institution, the University would have no more use for Sorsby's NIL for its own promotion. Recognizing this, the Agreement provided that both Sorsby's continued eligibility and enrollment were "a material inducement for the University's entry into this Agreement and the valuation of the NIL Rights," and that "the value of the NIL Rights are materially and directly tied" to them. Agreement § 7; Compl. ¶ 23.

The Agreement is clear that if that status changed in any way—such as if Sorsby transferred—that would constitute a breach. Agreement § 12(f); Compl. ¶ 33. The Agreement defined a "Transfer" as either (1) Sorsby's signaling or indicating that he "intends to transfer to another university" or (2) if Sorsby "otherwise cease[s] to be enrolled as a student at" the University. Agreement § 12(f); Compl. ¶ 32. Sorsby agreed that such a breach would result in "ongoing substantial harm to the University that would be difficult, at present [as of July 1, 2025], to calculate." Agreement § 12(f); Compl. ¶ 33. That difficulty was acute at the time of the Agreement's execution, when neither party knew how the upcoming season would unfold and what impact it might have on Sorsby's NIL value. Compl. ¶¶ 34–35.

The parties thus made a reasonable best estimate as to the harm the University would incur

if Sorsby breached by transferring. They did so in the usual way, with a standard liquidated damages clause: "in the event of breach due to Transfer, [Sorsby] agrees to pay the University, within thirty (30) days after any Transfer, as liquidated damages and not as a penalty, the sum of one million dollars ($1,000,000)." Compl. ¶ 35; Agreement § 12(f). This clause also protected Sorsby from the potential for additional damages: "[p]rovided that [Sorsby] timely notifies the University of the Transfer... and timely pays the above liquidated damages, the University agrees not to seek additional damages from [Sorsby] relating to the Transfer." Agreement § 12(f).

**III.    Aided by the University's promotional efforts, Sorsby's visibility and recognition increased during the 2025 football season.**

The University invested substantial resources to develop and promote Sorsby as a student-athlete. Compl. ¶¶ 1, 6, 15–16, 18. Sorsby's play improved and he led the team to a 7–5 season. *Id.* ¶ 29. All of the University's football games were televised, and Sorsby became a household name beyond the University fanbase and alumni community. *Id.* ¶¶ 29–30. Sorsby accomplished this with the support of the Cincinnati Bearcats' national brand, the University's promotion of him and the program, and the broad reach of the Big 12 Conference. *Id.* ¶¶ 13, 15. In this environment, Sorsby elevated both his play and his public profile; in turn, this increased the value of his NIL and benefited the University's brand. *Id.* In short, just as the parties anticipated in the Agreement, Sorsby's NIL value was "increasing [in] value over time as the University's promotional efforts and [his] successes help[ed] to augment [his] recognition and visibility." *Id.* ¶ 30.

**IV.    Sorsby breached the Agreement by transferring to another university a year before the end of the Agreement's term.**

On December 1, 2025—just five months into the term of the Agreement, and right at the end of the University's regular season schedule—Sorsby breached the Agreement. He informed the University that he (1) was done playing for the University, (2) would no longer participate in more practices or team activities, and (3) would not play or attend the University's January 2, 2026,

6

bowl game. Compl. ¶¶ 3, 36–37. Sorsby then filed paperwork with the University stating his intent to transfer, and he then formally entered the transfer portal on January 2, 2026. *Id*. ¶¶ 5, 38.

In an effort to preserve both its investment in Sorsby's NIL rights and its relationship with Sorsby as a student-athlete, the University attempted to work with Sorsby's agent to reach an agreement to keep Sorsby at the University. *Id*. ¶¶ 39–40. Nonetheless, Sorsby quickly signed a new NIL agreement with another university for between $4 million and $6 million. *Id*. ¶¶ 42–43.

News of Sorsby's transfer broke on January 4, when he personally told ESPN about his move. *Id*. ¶ 42. The very next day, Sorsby's new university—now purportedly armed with Sorsby's NIL licensing rights—took out a massive billboard in New York City's Times Square. *Id*. ¶ 45. The billboard celebrated Sorsby's transfer and featured a photo of him in the new university's full uniform. Sorsby participated in these activities despite his promise under the Agreement not to "engage in any activity that would be contrary to or in conflict with any marketing, advertising, publicizing, promotional or endorsement activity or agreement entered into by the University." *Id.*

Sorsby's transfer severely impacted the corresponding "value of the NIL Rights" that the University bargained and paid for, and which the Agreement acknowledges. The University is now without the highly visible representative that it bargained for, and due to Sorsby's transfer and breaches, the University's bargained and paid for NIL rights were destroyed. *Id*. ¶¶ 46-48.

In light of the University's significant investments in Sorsby and the subsequent loss of the value of the NIL rights he licensed to the University, the University asked Sorsby to fulfill his promise to pay liquidated damages. *Id*. ¶¶ 41, 50. Sorsby's representative responded that Sorsby had no intention to pay what he owes. *Id*. ¶¶ 50, 52. The University therefore filed suit to enforce its rights under the Agreement, to hold Sorsby to the promises he made in the Agreement, and to recover damages and other appropriate relief for Sorsby's breaches of his promises.

7

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the court must accept all allegations in the Complaint as true and draw all inferences in the University's favor. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). So long as the Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the Court should deny Sorsby's Motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

When a motion to dismiss triggers questions of contract interpretation or enforcement, such questions are governed by state law. *Cogent Sols. Grp. v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013). Here, any state law questions are governed by Ohio law. *See* Agreement § 19. Under Ohio law, a party seeking to invalidate a liquidated damages clause in a contract bears the burden of proving that it is unenforceable. *Kraft Elec. Contracting, Inc. v. Lori A. Daniels Irrevocable Trust*, 136 N.E.3d 951, 958 (Ohio Ct. App. 2019).

## LAW AND ARGUMENT

Sorsby attempts to end this case at the pleadings stage by asserting new purported "facts" from outside the pleadings. This approach is fatal to a Rule 12(b)(6) motion. The facts as pled in the Complaint, which the Court must accept as true, state a plausible breach of contract claim. And while Sorsby cites a few cases to support the legal proposition that certain kinds of liquidated damages provisions are unenforceable, *none* involve a pleadings-stage dismissal.

### I.      The Complaint states a plausible claim for relief for breach of contract.

The Complaint asserts one count for breach of contract and its averments demonstrate a plausible, cognizable breach of contract claim. "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach."

8

*Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St. 3d 453, 463, 97 N.E.3d 458, 469 (Ohio 2018).

Here, the Complaint establishes the existence of an agreement between the University and Sorsby. Compl. ¶¶ 19, 31, 57. It details Sorsby's duties under the Agreement, including paying liquidated damages if he transferred to another university. *Id*. ¶ 35. And it establishes that if Sorsby transferred without fulfilling his duty to pay the University the resulting liquidated damages, that action would constitute a breach of the Agreement. *Id.* ¶¶ 32, 33, 35, 49–51. At this stage, the Court must accept these well-pleaded facts as true. *Iqbal*, 556 U.S. at 678.

**II.     A challenge to a liquidated damages clause is highly fact-dependent, requiring a fully developed record to resolve.**

The Agreement's liquidated damages clause is enforceable. Ohio courts will not hesitate to enforce a liquidated damages clause so long as it: (1) concerns a damages amount that is uncertain and hard to prove, (2) is not so unconscionable and disproportionate in amount as to show that it did not express the parties' true intention, and (3) is consistent with the conclusion that a breach would require payment of the liquidated amount. *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St. 3d 27, 29, 465 N.E.2d 392, 394 (Ohio 1984); *accord* Doc. 7, PAGEID # 33.

A court examines the enforceability of a liquidated damages clause "in light of what the parties knew at the time the contract was formed" and whether such clause "was reasonable *at the time of formation* and bears a reasonable (not necessarily exact) relation to actual damages." *Boone Coleman Constr., Inc. v. Piketon*, 145 Ohio St. 3d 450, 460, 50 N.E.3d 502, 513 (Ohio 2016) (emphasis in original; quotation omitted); *accord Demczyk v. Mutual Life Ins. Co.*, 126 F.3d 823, 829 (6th Cir. 1997) (same; Ohio law). Given the highly fact-sensitive nature of this issue, courts do not resolve these enforcement challenges on the pleadings, as shown below.

**A.  The case law supports enforcing the Agreement's liquidated damages clause.**

The case law supports the enforcement of liquidated damages where, as here, a contract

counterparty breaches a contract via early departure to take a more lucrative deal.

In *Kent State University v. Ford*, Kent State's basketball coach terminated his contract early to take a much higher-paying position at Bradley University. 26 N.E.3d 868 (Ohio Ct. App. 2015). Kent State sued the coach to enforce the contract's liquidated damages clause, which required him to pay $1,200,000—his $300,000 annual salary multiplied by the four remaining years on the contract—if he left Kent State before the end of the contract's term. *Id.* at 870. The coach asserted that the liquidated damages were an unenforceable penalty and failed the *Samson* factors. *Id.* at 873. The Ohio Court of Appeals rejected those arguments, citing record evidence on the impact of a coach's departure on ticket sales, recruiting, and retention. *Id.* at 873–76.

Similarly, in *Vanderbilt University v. DiNardo*, Vanderbilt's football coach breached his contract by leaving early for a much higher-paying head coach position at Louisiana State. 174 F.3d 751 (6th Cir. 1999). Vanderbilt sued to recover the roughly $280,000 in liquidated damages provided for in his contract and prevailed on summary judgment. *Id.* at 753. The Sixth Circuit affirmed, citing record evidence that the agreement accurately reflected the parties' understanding of the difficulty of ascertaining damages in the event of a breach. *Id.* at 757.

Both cases upheld the respective liquidated damages clause, and both illustrate that a well-developed factual record is necessary to resolve a challenge to the enforcement of such a clause. Even Sorsby concedes this. *See* Doc. 7, PAGEID # 33 (quoting *Samson*, 465 N.E.2d at 394: it "depends upon the operative facts and circumstances surrounding each particular case"). The case law is consistent on this point. *See Kraft Electrical*, 136 N.E.3d at 958 (defendant's attack on liquidated damages required him to "introduce [ ] evidence that [they were] an unenforceable contractual penalty"); *Lake Ridge Acad. v. Carney*, 66 Ohio St. 3d 376, 381–82, 613 N.E.2d 183, 188 (1993) (enforcement question requires examination of "the particular facts surrounding the

10

making and execution of the contract") (quotation omitted).

This fact-intensive nature of such clauses precludes pleadings-stage attacks such as Sorsby's efforts here. *See Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *9 (S.D. Ohio June 17, 2021) (concluding that the validity of a liquidated damages provision "depends heavily on the facts surrounding a given contract…. And discovery is necessary to assess those facts."); *Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F. Supp. 2d 956, 959 n.2 (N.D. Ohio 2007) ("to determine the [liquidated damages] provision's enforceability, the Court must consider evidence outside the pleadings").[4] Sorsby's pleadings-stage attack on the Agreement's liquidated damages clause is thus premature. His Motion should therefore be denied.

**B. Sorsby improperly relies on a myriad of factual assertions outside the pleadings.**

In support of the Motion, Sorsby also relies on a variety of "facts" not included in either the Complaint or the Agreement. In particular, at multiple points in his Motion, Sorsby asks the Court to accept as true that the Agreement is a "pay-for-play employment contract," that the parties' intent was to "pay Sorsby to play football," and that Sorsby's NIL rights "have very little" or "*de minimis*" monetary value. Doc. 7, PAGEID # 26, 28, 31, 33–37, 41–43. And Sorsby's Motion asks the Court to accept as true that Sorsby's NIL "does not benefit UC in any significant respect, especially compared to the NIL value of the quarterback who replaced him," that "UC is saving money by paying a replacement quarterback less money," that "UC has multiple options for starting quarterbacks," that Sorsby "helped recruit UC's expected starter for next season before he left," that the University "was fully informed of Mr. Sorsby's desire to transfer beforehand," that its "coaches and officials cooperated with Mr. Sorsby in effectuating the transfer," and that

---

[4] *See also Secure Our City, Inc. v. ECI Sys., LLC*, 594 F. Supp. 3d 96, 104 (D. Mass. 2022) ("the enforceability of a liquidated damages provision is fact-intensive" and "suitable for summary judgment"); *Lyu v. Alfa Chemistry Inc.*, 23-CV-7951, 2025 WL 1093134, *12 (E.D.N.Y. Apr. 13, 2025) (similar).

11

this lawsuit is really about "send[ing] a message to its other players," because "UC's coaches and officials believe that losing football players through the NCAA transfer portal makes it difficult to manage their rosters and compete effectively." *Id*., PAGEID # 28–29, 36–37, 39–43.

Not only are Sorsby's assertions outside the pleadings, but they also attempt to rewrite the law on NIL promotional licensing and the non-employment relationship status between universities and student-athletes. Ohio law expressly states that student-athletes like Sorsby are not university employees, and that NIL compensation creates no such employment relationship. *See* Ohio Rev. Code § 3376.11. Instead, Ohio law makes clear that the relationship is strictly for NIL promotional licensing. Ohio Rev. Code § 3376.09.

Sorsby's "employment" counter-narrative also seeks to relitigate the *House* case that established the operative NIL compensation framework. Sorsby asks the Court to reopen *House* altogether and to rule, in collateral litigation, at the pleadings stage, that the Court's order in *House* is a sham. Doc. 7, PAGEID # 26, 28, 31, 34–35, 39–43. He asks this Court to disregard that order and rule that he was "actually" an employee all along. *See id.* Again, to support this idea, he presents only a factual counter-narrative from outside the pleadings, and no legal authority.

The Court must reject any "facts" outside of the pleadings and, instead, must accept the Complaint's allegations as true. *Erickson*, 551 U.S. at 93–94.

### C. Sorsby's cases further support denial of the Motion.

None of the cases cited in Sorsby's Motion support Rule 12(b)(6) dismissal, and indeed they all show why the law requires that his Motion be denied.

Additionally, Sorsby predominantly cites cases where the liquidated damages clause at issue was upheld and enforced. *See Atlas Noble, LLC v. Krizman Enters.*, 692 F. App'x 256, 267–68 (6th Cir. 2017) (affirming lower court's finding that liquidated damages were "reasonable and enforceable"); *Lake Ridge*, 66 Ohio St. 3d at 384, 613 N.E.2d at 189–90 (affirming post-trial

12

determination that liquidated damages were enforceable); *Jones v. Stevens*, 112 Ohio St. 43, 54–58, 146 N.E. 894, 897–98 (1925) (same); *B & G Props. Ltd. P'ship v. Off. Max, Inc.*, 3 N.E.3d 774, 786 (affirming trial court's summary judgment enforcing liquidated damages) (Ohio Ct. App. 2013); *see also Demczyk*, 126 F.3d at 830 (reversing lower court finding that liquidated damages clause was unreasonable; remanding for consideration of other evidence).

Sorsby cites only two cases in which courts found liquidated damages clauses to be unenforceable, and both were decided at the summary judgment stage, with the benefit of a fully developed record. *See Samson*, 12 Ohio St. 3d at 28, 465 N.E.2d at 393; *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 998–99 (S.D. Ohio 2013).

Sorsby fails to identify any case where a court grants the relief Sorsby now seeks: invalidating a liquidated damages clause without any factual record and ignoring the well-pled allegations of a complaint. Sorsby's Motion should be denied accordingly.

**III.     The liquidated damages clause in the Agreement is enforceable.**

The liquidated damages clause in the Agreement satisfies the *Samson* factors and is enforceable. The only evidence that can be considered now is the Agreement, the contract on which this action is based. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011). The plain language of the Agreement shows its facial enforceability as to all three *Samson* factors.

**A.  Damages from Sorsby's breach were uncertain and difficult to quantify.**

To begin, the Agreement expressly sets forth the parties' agreed-upon belief that actual damages from a breach caused by Sorsby's transfer to another university would be "uncertain as to amount and difficult of proof." *Samson*, 465 N.E.2d at 394. Specifically, it states that such a breach would "result[ ] in ongoing substantial harm to the University that would be difficult, at present, to calculate." Agreement § 12(f); *accord* Compl. ¶¶ 33–35.

The surrounding pleaded facts further show the satisfaction of this factor. Importantly, at

13

the time they entered into the Agreement, Sorsby and the University did not know the future value of Sorsby's NIL rights. Compl. ¶ 27; *see Demczyk*, 126 F.3d at 829 (temporal focus is the "time of formation"). In fact, the Agreement was signed on prospect before the 2025 season, before Sorsby had achieved substantial recognition and visibility but at a time when the University believed it could help him become a valuable representative of the University. Compl. ¶¶ 1, 27, 34. Both Sorsby and the University believed that Sorsby's NIL would have "increasing [ ] value over time as the University's promotional efforts and [his] success help to augment [his] recognition and visibility," and the Agreement provided that Sorsby's licensing compensation would increase accordingly. *Id.* ¶¶ 1, 26, 30. Indeed, the value of Sorsby's new NIL agreement— between $4 million and $6 million—supports that the $1 million liquidated damages amount was in fact much *lower* than the University's actual damages attributable to Sorsby's breach of the Agreement. *Id.* ¶¶ 5, 43–44. The Complaint thus fully pleads the first *Samson* factor.

Sorsby disputes that the University's damages from his transfer would be difficult to prove, because, according to him, the value of his NIL rights was *de minimis*. Doc. 7, PAGEID # 33–37. To support this conclusory statement, Sorsby first points to an Ohio statute, Ohio Rev. Code § 2741.07, which he says states that the value of NIL generally is "worth between $2,500 and $10,000." Doc. 7, PAGEID # 31. His premise is incorrect. The statute in question speaks only to civil actions for "the unauthorized use of an individual's persona for a commercial purpose[.]" Ohio Rev. Code § 2741.07. And in any event, that statute allows an aggrieved athlete to hold a defendant liable for *either* "[a]ctual damages, including any profits derived from and attributable to the unauthorized use"—or, "*[a]t the election of the plaintiff and in lieu of actual damages*, statutory damages" of between $2,500 and $10,000. *Id.* (emphasis added); *see also Sammons v. Keystone Am., Inc.*, 180 N.E.3d 42, 47 (Ohio Ct. App. 2021) (noting that statutory damages are

14

elective, and that "actual damages [ ] in a given case could far exceed" any statutory cap).

Based on its express language, Ohio Rev. Code § 2741.07 is inapplicable here. Sorsby is not a plaintiff seeking relief for some unauthorized use of his NIL. Nor does Ohio Rev. Code § 2741.07 nullify any written agreement governing the licensing of a person's NIL, such as the Agreement here. Sorsby's reliance on this statute is therefore misplaced.

Nor is Sorsby's reliance on *Roe v. Amazon.com* on point. That case concerned private persons' statutory claims against a large corporation for unauthorized use of their likenesses. 714 F. App'x 565 (6th Cir. 2017). The claim failed at summary judgment because the plaintiffs failed to establish that their likenesses—a photo celebrating their engagement—had any "commercial value." *Id.* at 568–69. Here, however, Sorsby cannot reasonably claim that his NIL rights have no commercial value when, as pleaded, two universities agreed to pay millions of dollars for those rights, and when the successor university's very first move upon signing him was to promote itself by displaying his name, image, and likeness, in full team uniform, in the middle of Times Square.

Similarly, Sorsby's suggestion that *James v. Bob Ross Buick, Inc.* somehow establishes that his NIL rights have only "nominal" value is misguided. The *James* court concluded that the plaintiff, who had brought a statutory claim against the defendant for its unauthorized use of his likeness, could "seek nominal, compensatory, and, if appropriate, punitive damages[.]" 167 Ohio App. 3d 338, 345, 855 N.E.2d 119, 124 (Ohio Ct. App. 2006).

Sorsby then points to two isolated features of the Agreement, the non-exclusive nature of the NIL license and the fact that the University was not "obligated" to use Sorsby's NIL rights, to attempt to support his assertion that his NIL had *de minimis* value. Doc. 7, PAGEID # 35. To begin, these provisions are standard components of student-athlete NIL licensing—the *House* settlement itself establishes non-exclusive NIL licensing. *See House*, No. 4:20-cv-03919, Doc.

15

958-1 at 59 (N.D. Cal. May 5, 2025) (parties "have the right to enter into an *exclusive or non-exclusive* license and/or endorsement agreement for that student-athlete's NIL....") (emphasis added); 803 F. Supp. 3d at 972, 1018 (approving same, "Docket No. 958-1"). And Sorsby's suggestion that a non-exclusive license is valueless makes no sense and ignores college athletics NIL practices, by which universities typically obtain a license to use their student-athletes' NIL, but the student-athlete retains the right to license his NIL to endorse other products and brands. *See* Agreement § 6. Indeed, such additional licensing would only further increase Sorsby's profile and thus increase the value of his NIL rights to the University. Compl. ¶¶ 1, 28. Plus, the NIL license *was* exclusive as to *which university he represented*, which is what gave Sorsby's NIL great value to the University. *Id.* ¶ 35; Agreement § 12(f). By transferring, Sorsby breached that contractual limitation, and triggered his promise to pay liquidated damages. *Id.* And as for Sorsby's argument that the University was not "obligated" to use Sorsby's NIL, he never explains the relevance of this—and as is clear, the University *did* use his NIL significantly. Compl. ¶¶ 28–30.

Sorsby further contends that his NIL rights are less valuable to the University because the Agreement does not include the right to broadcast Sorsby's games. Doc. 7, PAGEID # 35. But the Agreement could not include such a right—again, *House* precludes it. *See House*, No. 4:20-cv-03919, Dkt. 958-1 at 59 (N.D. Cal. May 5, 2025). And indeed, the Agreement implicitly acknowledges this restriction. Agreement § 3(d).

In sum, Sorsby's speculative and conclusory arguments fail to demonstrate that damages from his transfer to another university were certain, easy to calculate, or "*de minimis*."

### B. The liquidated damages are not unconscionable or disproportionate.

Next, Sorsby asserts that the Complaint should be dismissed "because $1 million [in liquidated damages] is not reasonable or proportionate to the contract as a whole or to the $875,800 that Mr. Sorsby earned." Doc. 7, PAGEID # 38. This argument, too, is premature and departs from

holdings in applicable case law.

To determine proportionality, courts do not look to the amount of prior payments made under the contract, but rather "to the *foreseeable possible damage.*" *Kent State*, 26 N.E.3d at 875 (emphasis added). That is, they do not compare the liquidated damages amount to the dollars paid at the time of breach, but rather to the actual harm. *Id.*; *accord Vanderbilt*, 174 F.3d at 756 ("The stipulated damage amount is reasonable in relation to the amount of damages that could be expected to result from the breach.").

Courts can also look to the compensation provided in the breaching party's new contract as a measure of the non-breaching party's harm. *Kent State*, 26 N.E.3d at 875–76. In *Kent State*, the court compared the defendant coach's new salary of $700,000 per year to his prior salary of $300,000 and concluded that the university's damages were, at minimum, a loss of "market value in coach [of] $400,000 per year, for four years"—a total of $1.6 million, which was *more* than the liquidated damages. *Id.* The *Kent State* court further rejected the coach's argument that the $1.2 million liquidated damages was disproportionate to the $300,000 salary he had received thus far under the contract, because the proper focus was on the total value of *the contract as a whole* and on the *ensuing harm caused to the university*. *Id.* at 876.

Here, the $1 million liquidated damages amount is reasonable. It is less than 50% of the Agreement's total value—not "more than 100%," as Sorsby contends—and it is less than what Sorsby would have received from the University during the 2026 football season had he not transferred. Doc. 7, PAGEID # 39; Agreement, Schedule A. Even by Sorsby's incorrect proportionality analysis that compares liquidated damages to prior compensation, the liquidated damages here would be much more "proportionate" than those upheld in *Kent State*, which were 400 percent of the prior compensation. Further, the liquidated damages sum is also much less than

the University's lost market value: the $4 million to $6 million that Sorsby reportedly will receive under his new NIL agreement with his new university. *Kent State*, 26 N.E.3d at 875–76. The liquidated damages sum is thus not "manifestly unconscionable, unreasonable, and disproportionate in amount" as a matter of well-established law. *Samson*, 465 N.E.2d at 394.

Further, Sorsby's "billions of dollars" reference from the concurrence in *NCAA v. Alston*, 594 U.S. 69 (2021) does not alter the reasonableness of the liquidated damages amount. Sorsby makes much of the concurrence's observation that college sports, in the aggregate, generate "billions of dollars in revenues for colleges every year." Doc. 7, PAGEID # 31, 34, 38 (quotation omitted). But that decontextualized quote—referring to hundreds of universities and their 500,000-plus student-athletes—does not mean, as Sorsby insists, that he was "grossly underpaid" under the Agreement or that the liquidated damages are therefore unreasonable. *Id*., PAGEID # 38. Sorsby seems to suggest that all student-athletes should be paid "billions of dollars"—a result that would certainly be "unreasonable and disproportionate" to the value of their respective NIL rights. *Id.*

### C.  The liquidated damages clause reflects the parties' intent.

Finally, the Agreement shows the parties' intent that the liquidated damages amount would be paid in the event of breach. *Samson*, 12 Ohio St. 3d at, 29, 465 N.E.2d at 394. The Agreement speaks for itself and shows that intent. Agreement § 12(f). And as discussed above, it explains why the parties had that intent—including the difficulty in calculating the harm in the event of transfer, and the increasing value of Sorsby's NIL over time. *See id.*; Compl. ¶¶ 2, 26, 30, 33–35, 44. Of course, "the plain language of the agreement" is the best evidence of the parties' intent. *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 159 Ohio St. 3d 194, 197, 150 N.E.3d 28, 31 (Ohio 2019) ("we presume that the intent of the parties is reflected in the plain language of the contract").

Sorsby's only attack on this point is his unsupported, outside-the-pleadings assertion that "the parties' joint intent" was really "to pay Mr. Sorsby to play football," and that the University

18

really had a "punitive intent to penalize Mr. Sorsby for transferring, and to use that penalty as a threat against other UC student-athletes who do the same." Doc. 7, PAGEID # 41. Again, these kinds of new assertions from outside the pleadings have no place in a Rule 12(b)(6) Motion. The Court should ignore them and deny the Motion accordingly.

### IV.    The University's claim for attorneys' fees should proceed.

Finally, Sorsby seeks dismissal of the University's attorneys' fee claim, but that issue is no more susceptible to pre-discovery resolution than the liquidated damages clause. And, contrary to Sorsby's assertion, the University did not have to plead bad faith as a separate claim. Rather, it is a facet of the University's existing breach of contract claim. *See Bryan v. Bank of Am. Home Loans Servicing, LP*, No. 3:10 CV 959, 2011 WL 5526071, at \*3 (N.D. Ohio Nov. 14, 2011).

Ohio law defines bad faith as "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-CV-399, 2015 WL 5636897, at \*9 (S.D. Ohio Sept. 25, 2015) (quotation omitted; Ohio law). The University's allegations of bad faith meet the *Twombly/Iqbal* standard, all that is required at this early stage. *See* Compl. ¶¶ 6, 31, 60 (alleging Sorsby acted in bad faith by failing to try to renegotiate the Agreement prior to transferring and by knowingly and willfully flouting his contractual obligations).

Throughout, the Complaint pleads facts showing Sorsby's bad faith and that he never intended to honor the Agreement's liquidated damages clause. In an unsuccessful attempt to cast the liquidated damages clause as a penalty, Sorsby routinely falls back on the argument that he had a "right" to transfer. Doc. 7, PAGEID # 26–28, 41–43. Sorsby's argument presumes that because the NCAA permits student-athletes to transfer, this option somehow releases him from his contractual obligations. It does not. While Sorsby was free to transfer to another university, which

19

he did, he is also subject to the contractual ramifications for doing so, including triggering the Agreement's liquidated damages clause.

Nor do Sorsby's arguments on this subject find any support in case law. All the cases he cites on attorneys' fees are post-discovery decisions—and one actually *affirmed* the trial court's attorney fee award. *See Hall v. Frantz*, No. 19630, 2000 WL 670662, at *7 (Ohio Ct. App. May 24, 2000); *see also Marrow v. SSOE, Inc.*, 599 F. Supp. 3d 593, 606–07 (N.D. Ohio 2022) (summary judgment stage); *Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-CV-399, 2015 WL 5636897, at *14 (S.D. Ohio Sept. 25, 2015) (post-judgment stage).

The University has properly articulated a cognizable claim for attorneys' fees, it should be permitted the opportunity to develop facts in support of its claim, and the Motion should be denied.

## CONCLUSION

For the foregoing reasons, the Sorsby's Motion to Dismiss is without merit and should be denied, allowing this case to proceed.

Dated: May 18, 2026

Respectfully submitted,

*/s/ David M. DeVillers*
David M. DeVillers (0059456), Trial Attorney
BARNES & THORNBURG LLP
41 South High Street, Suite 3300
Columbus, Ohio 43215
Tel (614) 628-1446 | Fax (614) 628-1433
DDeVillers@btlaw.com

Christopher J. Bayh, *pro hac vice*
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Tel 317-231-7449 | Fax 317-231-7433
Chris.Bayh@btlaw.com

*Counsel for Plaintiff University of Cincinnati*

20

## CERTIFICATE OF SERVICE

I certify that on May 18, 2026, a copy of the foregoing will be served on the counsel of record by operation of the Court's ECF filing system.

*s/ David M. DeVillers*